UNITED STATES of America,
Plaintiff,

v.

.J. B. WILLIAMS COMPANY, INC. and
Parkson Advertising Agency, Inc.,
Defendants.

No. 70 Civ. 1589.

United States District Court,
S. D. New York.

Jan. 22, 1973.

Whitney North Seymour, Jr., U. S. Atty., by Patricia M. Hynes, Asst. U. S. Atty., New York City, Janet D. Saxon, Bureau of Consumer Protection, F. T. C., Washington, D. C., for plaintiff.

Hughes, Hubbard & Reed, by Powell Pierpoint, New York City, Covington & Burling, by James H. McGlothlin, John Vanderstar, Washington, D. C., Henry E. Schultz, New York City, for defendants.

MOTLEY, District Judge.

### Opinion on Motion for Summary Judgment

This action was instituted against defendants to recover civil penalties for alleged violations of a Federal Trade Commission (FTC) cease and desist order. Federal Trade Commission Act (F.T.C. Act), Section 5(l), 15 U.S.C. § 45(l).

The order, which was enforced by the Court of Appeals for the Sixth Circuit with modifications, see J. B. Williams Company v. Federal Trade Commission, 381 F.2d 884 (6th Cir. 1967), reads in pertinent part as follows:

IT IS ORDERED that respondents, The J. B. Williams Company, Inc., a corporation, and Parkson Advertising Agency, Inc., a corporation, . . . directly or through any corporate or other device, in connection with the offering for sale, sale or distribution of the preparation designated Geritol Liquid or the preparation designated Geritol Tablets, or any other preparation of substantially similar composition or possessing substantially similar properties, under whatever name or names sold, do forthwith cease and desist from:

1. Disseminating or causing to be disseminated by means of the United States mails or by any means in commerce, as "commerce" is defined in the Federal Trade Commission Act, any adverstisement

\* \* \* \* \* \*

(b) which represents directly or by implication that the preparation is a generally effective remedy for tiredness, loss of strength, run-down feeling, nervousness or irritability;

(c) which represents directly or by implication that the preparation is an effective remedy for tiredness, loss of strength, run-down feeling, nervousness or irritability in more than a small minority of persons experiencing such symptoms;

(d) which represents directly or by implication that the use of such preparation will be beneficial in the treatment or relief of tiredness, loss of strength, run-down feeling, nervousness or irritability, unless such advertisement expressly limits the claim of effectiveness of the preparation to those persons whose symptoms are due to an existing deficiency of one or more of the vitamins contained in the preparation, or to an existing deficiency of iron or to iron deficiency anemia, and further, unless the advertisement also discloses clearly and conspicuously that: (1) in the great majority of persons who experience such symptoms, these symptoms are not caused by a deficiency of one or more of the vitamins contained in the preparation or by iron deficiency or iron deficiency anemia; and (2) for such persons the preparation will be of no benefit;

(e) which represents directly or by implication that tiredness, loss of strength, run-down feeling, nervousness or irritability are generally reliable indications of iron deficiency or iron deficiency anemia;

\* \* \* \* \* \*

In Matter of J. B. Williams Company, Inc., Federal Trade Commission Docket No. 8547, November 24, 1967. (Modified order to cease and desist.)

This order became final by operation of law on December 24, 1967, 15 U.S.C. § 45(i), and has remained in effect since that date. The validity of the order is not subject to question in this action. *See* Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 54, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); Piuma v. United States, 126 F.2d 601, 603 (9th Cir.), cert. denied, 317 U.S. 637, 63 S.Ct. 28, 87 L.Ed. 513 (1942); United States v. H. M. Prince Textiles, Inc., 262 F.Supp. 383, 388 (S.D.N.Y.1966); United States v. Vitasafe Corporation, 212 F.Supp. 397, 398 (S.D.N.Y.1962); *cf.* Parke, Austin & Lipscombe, Inc. v. Federal Trade Commission, 142 F.2d 437, 442 (2d Cir.), cert. denied, 323 U.S. 753, 65 S.Ct. 86, 89 L.Ed. 603 (1944).

The alleged violations of the order consist of the dissemination by defendants of eleven different television advertisements on a total of 100 separate occasions. The United States seeks the maximum penalty of $5000 for each violation, as prescribed by Section 5(*l*), of the F.T.C. Act, 15 U.S.C. § 45(*l*), or a total of $500,000 in penalties against each defendant.

Before initiation of the instant suit by the United States, the facts which gave rise to it were properly certified by the FTC to the Attorney General of the United States, as required by Section 16 of the Act, 15 U.S.C. § 56.[1]

The United States now moves for summary judgment. For the reasons set forth below, the motion is granted.

I. *Propriety of the Motion for Summary Judgment*

A. *Defendants Do Not Have the Right to Trial by Jury.*

At the outset, the court must consider defendants' claim that summary judgment would be improper in this action because "the Sixth Amendment requires a jury trial in this case." Defendants' Memorandum 32. To support this argument defendants cite the Supreme Court decision in Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), which held that serious criminal contempts must be tried to a jury. Defendants argue that the instant action, seeking penalties of $1,000,000, is "inherently criminal in nature" and "so similar to a criminal contempt proceeding, [that] defendants must be extended exactly the same right to a jury trial as they would have enjoyed had the Commission sought to impose the identical fines in a criminal contempt proceeding." Defendants' Memorandum 32, 34–35.

Plaintiff simply responds in its reply brief that "this action, as well as all prior civil penalty actions involving violations of Federal Trade Commission orders to cease and desist, is clearly civil in nature." Reply Memorandum 14. Plaintiff also points out that no court has ever held that a civil penalty action involving violations of a FTC order was criminal rather than civil in nature.

The court does not believe that defendants' contention can be dismissed so easily. However, the court reads two lines of Supreme Court cases as clearly establishing that the Sixth Amendment right to jury trial does not apply to suits brought by the United States pursuant to Section 5(*l*).

The first line of cases culminating in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), considers the question of whether a sanction imposed by a particular legislative enactment is penal or regulatory in character. The Court in *Kennedy* set forth the revelant criteria for answering this question in a specific case. Absent conclusive evidence of congressional intent as to the penal nature of a statute, the Court noted, in dictum, that "[various]

---

1. Defendants' contention regarding the scope of the certification is discussed *infra,* at pp. 544–546.

factors must be considered in relation to the statute on its face."

Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry . . . . *Kennedy, supra,* 372 U.S. at 168–169, 83 S.Ct. at 567.

■ On their face the statutory provisions under which this action has been brought, Sections 5(*l*), 12 and 16 of the F.T.C. Act, 15 U.S.C. §§ 45, 52 and 56, are regulatory in character. There is no doubt that, taken together, one of their objects is to control false or misleading advertising of drugs in order to shield the typical consumer against deception and misinformation resulting from dissemination of such advertising and to give him an opportunity to make an intelligent choice about drug products. *See, e. g., J. B. Williams, supra,* 381 F.2d at 890; Federal Trade Commission v. Sterling Drug, Inc., 317 F.2d 669, 674 (2d Cir. 1963). In this way, too, the provisions promote the basic policy of the F.T.C. Act of curtailing unfair competition. *See, e. g.,* Federal Trade Commission v. Texaco, 393 U.S. 223, 225–226, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968). In the regulatory scheme, the civil penalty provision of Section 5(*l*) serves the distinct function of compelling compliance with FTC cease and desist orders which have been issued to protect the consuming public and the business community in the manner just described. *See* United States v. St. Regis Paper Company, 355 F.2d 688, 692–695 (2d Cir. 1966).[2]

■ Section 5(*l*) itself specifically provides that the fines imposed are a "civil penalty" to be recovered in a "civil action". While this characterization by Congress does not conclusively establish that the statutory provision is non-criminal in nature, *see* United States v. Constantine, 296 U.S. 287, 294, 56 S.Ct. 223, 80 L.Ed. 233 (1935), *cf. Kennedy, supra,* 372 U.S. at 163–184, 83 S.Ct. 554, it does furnish very strong evidence that Congress did not intend the provision to be punitive. Indeed, when Congress wished to make the dissemination of certain types of false advertising a criminal offense, it did exactly that. *See* 15 U.S.C. § 54(a). *See also* 15 U.S.C. § 50. A comparison of Section 12 with Section 14(a) of the F.T.C. Act strongly suggests that Congress viewed the sanction in Section 5(*l*) of the Act, as applied to the dissemination of false advertising, to be regulatory rather than penal in character. *See also St. Regis Paper, supra,* 355 F.2d at 692–699. (Held: Certification of facts by FTC to Attorney General pursuant to Section 16 of the Act is jurisdictional prerequisite to civil penalty suit under Section 5(*l*) of the Act.)

Furthermore, since here "the source of legislative concern can be thought to be the activity . . . from which the individual [or corporation] is barred," i. e. the dissemination of false advertising, the sanction imposed "is not punishment even though it may bear harshly upon one affected." Flemming v. Nestor, 363 U.S. 603, 614, 80 S.Ct. 1367, 1374, 4 L.Ed.2d 1435 (1960). *See id.* at 616 and 616 n. 9, 80 S.Ct. 1367, approved in dictum in *Kennedy, supra,* 372 U.S. at 169 n. 28, 83 S.Ct. 554. The sanction prescribed by Section 5(*l*) remains an integral part of the regulatory scheme and is not punishment in the criminal law sense, even though its imposition may have severe effects on violators of FTC cease and desist orders. *Cf. Flemming, supra,* 363 U.S. at 616 and 616 n. 9, 80 S.Ct. 1367.

---

2. The Court of Appeals noted that there was "little explanation or elaboration in [congressional] hearings or debates" about the section. 355 F.2d at 692.

■ Moreover, the civil penalty provision does not come into play only on a finding of scienter. *See* United States v. H. M. Prince Textiles, Inc., 262 F.Supp. 383, 388 (S.D.N.Y.1966) and cases cited therein; *cf.* Federal Trade Commission v. Algoma Lumber Company, 291 U.S. 67, 81, 54 S.Ct. 315, 78 L.Ed. 655 (1934). Nor is dissemination of the challenged advertisements punishable as a crime either under the F.T.C. Act or any other act of Congress.

■ Finally, Section 5(*l*) has not historically been regarded as a punishment, as evidenced by the fact that not a single decision which has been brought to the attention of the court has even hinted that the provision is penal in character. *Cf. St. Regis Paper, supra,* 355 F.2d at 694 (" . . . the 'Federal Trade Commission Act is not a revenue-raising or penal measure.' ") *See also* Federal Trade Commission v. Ruberoid Company, 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081 (1952) ("Orders of the Federal Trade Commission are not intended to impose criminal punishment . . . , but to prevent illegal practices in the future." At 473, 72 S.Ct. at 803) ; United States v. Vitasafe Corporation, 234 F.Supp. 710 (S.D.N.Y.1964), aff'd per curiam, 352 F.2d 62 (2d Cir. 1965). Nor can the court say that the penalty provided in Section 5(*l*) is in any sense excessive in relation to the clear prophylactic purpose of the statute.

■ On the other hand, the court does think, that the sanction prescribed by Section 5(*l*) may involve an affirmative disability or restraint[3] and may serve the incidental function of deterrence and retribution, once a cease and desist order takes effect. However, these factors are far outweighed by the significance of the other factors discussed above, particularly when all the factors are viewed in relation to the statute on its face. Moreover, although the absence of an affirmative disability and of deterrent effects as a result of a sanction generally establishes its non-criminal nature, *see Flemming, supra,* 363 U.S. at 617, 80 S.Ct. 1367, the inverse of this proposition is not true. *See* Rex Trailer Company v. United States, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956) and arguments of counsel in that case at 100 L.Ed. 150–152. *Cf.* pages 529–530 *infra.*

■ Therefore, applying the *Kennedy* criteria set forth above to the face of the statute, the court holds that the statutory provisions in question can only be interpreted as regulatory in nature and that the Sixth Amendment right to trial by jury is not applicable to defendants in this action.

■ This conclusion is buttressed by a second line of Supreme Court cases which consider the distinction between proceedings for civil contempt and those for criminal contempt. While serious criminal contempts must be tried to a jury, *see* Bloom v. Illinois, *supra,* the Supreme Court has held that a jury trial is not constitutionally required in civil contempt proceedings. *See* Shillitani v. United States, 384 U.S. 364, 365, 371, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966).

Defendants argue that the instant action should be likened to a criminal contempt proceeding, both because of "the enormous size of the fines sought" and "because plaintiff is seeking to recover a *penalty,* not compensatory damages." Defendants' Memorandum 33. (Emphasis in original.) The argument is untenable. Indeed precedents in both the Supreme Court and the Court of Appeals for this circuit convince the court that the instant action is so analogous to a civil contempt proceeding that no jury trial can or should be required here.

■ First, defendants' contention ignores the fact that civil contempt proceedings may be compensatory *or* coercive in nature. *See Shillitani, supra,* at 368–371, 86 S.Ct. 1531; Backo v. Local 281, United Brotherhood of Carpenters

3. The court is doubtful that Section 5(*l*) does involve an *affirmative* disability or restraint within the meaning of *Flemming, supra,* 363 U.S. at 617, 80 S.Ct. 1367.

and Joiners of America, 438 F.2d 176, 182 (2d Cir. 1970), cert. denied, 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1971). The statutory provision underlying the present action, Section 5(*l*) of the F.T.C. Act, is coercive in the same way that the conditional imprisonment imposed in *Shillitani* was coercive. It serves the same coercive function as does the liability to a fine for violating an injunction.

In each case, the question to be asked is: what does the sanction seek to accomplish? *See Shillitani, supra,* 384 U.S. at 370, 86 S.Ct. 1531. Where the sanction seeks to compel the person subject to it to do what he is legally required to do, the sanction is neither punitive nor criminal, but simply remedial in purpose. The penalty prescribed by Section 5(*l*) in the context of this action is "intended to be remedial by coercing the defendant[s] to do what [they have] refused to do," i. e. to cease and desist from disseminating adverstisements of a type which the Commission has found to be misleading. *See* Penfield Company of California v. Securities and Exchange Commission, 330 U.S. 585, 590, 67 S.Ct. 918, 91 L.Ed. 1117 (1947); Gompers v. Bucks Stove & Range Company, 221 U.S. 418, 442, 31 S.Ct. 492, 55 L.Ed. 797 (1911). *Cf.* L. G. Balfour Co. v. Federal Trade Commission, 442 F.2d 1, 24 (7th Cir. 1971).

Second, defendants' contention that the size of the fines sought in this action turns the action into a criminal proceeding is erroneous. The Supreme Court has upheld the power of courts to imprison witnesses who refuse to testify before a grand jury under a *civil* contempt order, even though the imprisonment may continue for a lengthy period and may depend upon "fortuitous circumstances, such as the life of the grand jury and when a witness appears." *Shillitani, supra,* 384 U.S. at 371–372, 86 S.Ct. 1531 at 1536. Similarly, the imposition of a fine of $5000 for each separate violation of a FTC cease and desist order while it is in effect remains a civil penalty, so long as it was within the

power of the violator to have abided by the order and thereby to have avoided the sanction. *See Shillitani, supra,* 368–370, 86 S.Ct. 1531. *See also* 8A J. Moore, Federal Practice ¶ 42.02 [2] (2d Ed. 1972).

In other respects as well, Section 5(*l*) resembles a civil contempt sanction. Liability to a civil contempt penalty does not require that violation of a court order be wilful. *See* McComb v. Jacksonville Paper Company, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1947); National Labor Relations Board v. Local 282, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 428 F.2d 994, 1001 (2d Cir. 1970). Nor does a civil contempt proceeding open to reconsideration the factual or legal basis of the underlying court order. *See* Maggio v. Zeitz, 333 U.S. 56, 69, 68 S.Ct. 401, 92 L.Ed. 476 (1948). These attributes of a civil contempt proceeding apply equally to actions under Section 5(*l*). *See* pages 527 and 529 *supra.*

Finally, defendants' argument that the FTC could have petitioned the Court of Appeals for the Sixth Circuit to bring criminal contempt proceedings against defendants for precisely the same alleged violations and asking for the same fines as are involved here (Defendants' Memorandum 33–34) is of no avail to defendants. Indeed, it simply points up the fact that Congress intended Section 5(*l*) to provide a non-criminal means for the FTC to enforce valid cease and desist orders. The statutory provision bolsters the regulatory goals of the entire Federal Trade Commission Act. In contrast, a criminal contempt proceeding to enforce a Commission order would have to be brought under the United States Criminal Code, 18 U.S.C. § 401, which is designed to vindicate the authority of the courts of the United States, a purpose wholly separate from that of the regulatory statute. *See, e. g.,* Cheff v. Schnackenberg, 384 U.S. 373, 377–378, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966); United States v. Schine, 260

F.2d 552, 557 (2d Cir. 1958), cert. denied, 358 U.S. 934, 79 S.Ct. 318, 3 L.Ed.2d 306 (1959); 8A J. Moore, Federal Practice ¶ 42.02 [2] (2d Ed.1972). Furthermore, the same conduct can amount to both civil and criminal contempt. *See* United States v. United Mine Workers, 330 U.S. 258, 298–299, 67 S.Ct. 677, 91 L.Ed 884 (1947); *Gompers, supra,* 221 U.S. at 441–442, 31 S.Ct. 492; 5 J. Moore, Federal Practice ¶ 38.33 [1] (2d Ed. 1971). Therefore, the observation of defendants does not support its claim that this action has the character of a criminal proceeding.

B. *FemIron*

FemIron is another iron preparation sold by defendant J. B. Williams Company. Counts ten and eleven of the complaint relate to the dissemination by defendants of FemIron advertisements. In their answer to the complaint, defendants deny that FemIron is a drug preparation within the meaning of Section 15 of the F.T.C. Act. Moreover, defendants contend that whether FemIron is covered by the FTC order presents a genuine issue of fact which cannot be determined on this motion for summary judgment. Both contentions are rejected.

Section 15(c) of the F.T.C. Act states that the term "drug" means, *inter alia,* "articles intended for use in the . . . prevention of disease in man . . . ." 15 U.S.C. § 55(c)(2). In paragraphs 46 and 50 of their answer, defendants aver that "FemIron is a product for the prevention of . . . iron deficiency anemia." Consequently, it is clear that FemIron is a "drug" and that FemIron advertisements are a proper subject of the FTC order. *See* 15 U.S.C. § 52.

The FTC order applies by its terms not only to advertisements of Geritol Liquid or Geritol Tablets, but also to advertisements of "any other preparation . . . possessing substantially similar properties, under whatever name or names sold." Defendants argue that FemIron does not possess properties substantially similar to those of Geritol. They support this argument with numerous affidavits of recognized experts in the fields of iron deficiency anemia and nutrition. Thus, defendants assert, there is a dispute as to this substantial issue of fact and the motion for summary judgment, at least as to counts ten and eleven, should not be granted. *See* Defendants' Memorandum 47–48.

The court rejects this argument for two reasons. First, it is undisputed that both Geritol and FemIron are iron preparations. They are also both indicated for use as a dietary supplement. The Geritol Tablet label states that it is "A HIGH POTENCY IRON AND VITAMIN TONIC" and that it may be used "As a dietary supplement: One (1) tablet daily." *See, e. g.*, Beutler Affidavit, Exhibit B, submitted by defendants. The FemIron label indicates that it is a "DAILY IRON SUPPLEMENT FOR WOMEN . . . DIRECTIONS: One tablet every day with any meal." *Id.* The labels in themselves establish that the preparations possess substantially similar properties within the meaning of the FTC order.

Second, the FTC order was designed to prohibit representations by defendants with respect to the benefit to be derived from the iron contained in Geritol. The phrase "possessing substantially similar properties" must be interpreted in this light. It is undisputed that FemIron contains only one nutritive ingredient, iron, and that it is less effective than Geritol, which contains more iron per tablet as well as seven vitamins. Therefore, FemIron's single chemical property is the very same property which distinguishes Geritol from other drug preparations and for which Geritol is advertised. In this sense, FemIron possesses properties substantially similar to those of Geritol. Indeed, FemIron's only nutritive property is identical to the most significant nutritive property of a Geritol tablet or a tablespoon of Geritol Liquid.

The thrust of all the expert affidavits submitted by defendants is that FemIron and Geritol differ in their properties, because FemIron contains *less* iron than does Geritol and is, therefore, *less effec-*

*tive* when taken as directed as a remedy for iron deficiency anemia. These observations are undoubtedly correct. However, it is disingenuous for defendants to argue that FemIron is exempt from the order because it is a less effective preparation than Geritol. To the extent that the representations prohibited by the order with respect to Geritol are deceptive, they are also deceptive with respect to FemIron. The court concludes that the dissemination of FemIron advertising is covered by the FTC order.

### C. *No Other Genuine Issues of Fact Remain to be Tried.*

Defendants contend that this is not a proper case for summary judgment because there are material issues of fact in dispute, including:

1) The proper interpretation of the FTC order;

2) Whether defendants had been given notice and a reasonable opportunity to discontinue the challenged advertisements; and

3) The meaning of each of the advertisements challenged in the complaint. Memorandum 24. *See id.* at 24–32, 36–46, 49–64. The court will consider each of these contentions in succession.

### 1. Meaning of the Order

▇▇▇▇ Interpretation of the FTC order is undoubtedly a question of law for the court to determine. In upholding the order with modifications on appeal, the Sixth Circuit necessarily decided that the modified order here in issue was not vague and fairly apprised defendants of what was expected of them. *See J. B. Williams, supra,* 381 F.2d at 891. Defendants cannot relitigate that issue in this action. *See* Federal Trade Commission v. Morton Salt Company, 334 U.S. 37, 54, 68 S.Ct. 822, 92 L.Ed. 1196 (1948).

▇▇▇▇ On the other hand, correct interpretation of the order requires the court to consider not only its plain language, but relevant proceedings before the FTC and the Sixth Circuit's decision as well. The court finds that the undisputed documentary evidence now before the court is more than sufficient to enable it to fully perform this task.[4]

### 2. Notice to Defendants of Alleged Violations

▇▇▇▇ The court disagrees with defendants' assertion that "it is settled that the Government may not impose penalties under 15 U.S.C. § 45(*l*) with respect to alleged violations of orders where these violations preceded Commission notice that the conduct was deemed in violation of the order." Defendants' Memorandum 58–59. Such notice is neither required by the statutory scheme nor by the Commission's rules and procedures. The only procedural step required by the F.T.C. Act before institution of a Section 5(*l*) suit is the certification of facts relating to the alleged violation to the Attorney General. *See* Section 16, 15 U.S.C. § 56. A blanket rule requiring prior notice by the Commission of alleged violations of its orders has absolutely no statutory basis whatever. *See generally* Government Reply Memorandum 27–39.

If defendants intend by this assertion to claim a violation of their right to due process in this case, the claim is rejected. The record shows that the FTC informed defendants that the advertisements contained in their first compliance report were in violation of the order. The Commission took the unusual step of permitting defendants to file a second compliance report. The Commission informed defendants in June, 1969, on the basis of this report, that they were still not in compliance with the order. When, after this notice and after 17 months since the order became final, defendants proceeded to disseminate the advertisements challenged here without prior approval by the Commission, defendants

---

4. Furthermore, the issues presented by defendants as to the meaning of the order, Memorandum 36–45, are apparently not in dispute. *See* Government Reply Memorandum 3–4.

acted at their own peril.[5] *Cf.* Federal Trade Commission v. Colgate-Palmolive Co., 380 U.S. 374, 394, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965). If defendants' argument were accepted, it would reduce Section 5(*l*) to meaninglessness.

### 3. Representations in the Advertisements

Defendants also oppose the motion for summary judgment on the ground that there are genuine issues of material fact as to what representations are made in the challenged advertisements and whether these representations are prohibited by the FTC order. Defendants argue that these factual questions must be submitted to a jury[6] and cite three court decisions in support of their argument.[7]

Plaintiff responds to this argument by citing seven cases where "courts in similar situations have held that no issue of fact is presented when the question before them is whether an advertisement falls within the prohibition of a cease and desist order and have disposed of these cases by summary judgment."[8]

Only one of the cases cited by the parties actually considered the precise issue

5. Indeed, defendants did have notice that the Commission considered six of the challenged advertisements in violation of the order. *See* Part III D. *infra* (discussion of counts 1–4, 8 and 9.)

6. The court doubts whether defendants can demand a jury trial as a matter of right pursuant to Fed.R.Civ.P. Rule 38(b). The action is in the nature of a civil contempt proceeding. *See* pp. 529–530 *supra.* The Seventh Amendment right to jury trial does not extend to actions for civil contempt. *See* 5 J. Moore, Federal Practice ¶ 38.33[2]–[3] (2d Ed. 1971); *cf. Shillitani, supra.* Nor has Congress provided for trial by jury as of right in Section 5(*l*) actions.

In any case, the court need not reach this question, since the court holds *infra* that no dispute of material fact remains to be resolved.

7. Defendants cite United States v. Fire Safety Devices, Civ.No.13254 (D.Md. 1962) (no written opinion); United States v. Hindman, 179 F.Supp. 926 (D.N.J.1960); and United States v. Americana Corporation, Civ.No.10858 (D. Md.1960) (no written opinion).

*Fire Safety* and *Americana* do not support defendants' contention because they involved the factual question of what *oral* representations were made by employees of the companies being sued. *See* Defendants' Memorandum 29n.1; Vanderstar Affidavit, Exhibits D and E; Hynes Affidavit, Exhibits D and E. Here, in contrast, the actual advertisements sued upon are before the court and their dissemination is undisputed.

The *Hindman* decision is not authoritative, for it was subsequently criticized by the Court of Appeals for the Third Circuit in United States v. Vulcanized Rubber & Plastics Company, 288 F.2d 257, 258n.2 (3d Cir. 1961), cert. denied, 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961). *See* note 10 *infra.*

8. Reply Memorandum 5. *See* United States v. Vulcanized Rubber & Plastics Company, *supra*; Piuma v. United States, 126 F.2d 601 (9th Cir.), cert. denied, 317 U.S. 637, 63 S.Ct. 28, 87 L.Ed. 513 (1942); United States v. Smith Fencer Corporation, 312 F.Supp. 666 (E. D.Mich.1970); United States v. Sav-Cote Chemical Laboratories, Inc., CCH 1971 Trade Cases ¶ 73,439 (D.N.J.1969); United States v. Bogolub, Civil No. 67–C–1138 (N.D.Ill.1967) (no written opinion); United States v. Winters, No. 66–195 Civ.T. (M.D.Fla.1966) (no written opinion); United States v. Modell, Civ. No. 127–366 (S.D.N.Y.1960).

In all of these cases, with the exception perhaps of *Vulcanized Rubber*, it was obvious that the representations made in the advertisements were in direct conflict with the FTC order at issue. For example, in *Piuma*, the FTC order prohibited the appellant from representing among other things that a particular product "is a gland tonic" or "constitutes a remedy for glands." The challenged advertisements contained the following language: "Money-Back Gland Tablet Calls for Trial . . . . its purpose is to help stimulate all the glands to healthy activity." 126 F.2d at 602–603. As for the *Bogolub* and *Winters* cases, in which there were no written opinions, the court has based its conclusion on the papers filed in those actions. *See* Hynes Affidavit, Exhibits A and B. The significance of *Modell* is impossible to ascertain from the information provided by the parties. *See* Defendants' Memorandum 29n.2; Government Reply Memorandum 6; Hynes Affidavit, Exhibit C.

presented here. *See* notes 7 and 8 *supra.* That case is United States v. Vulcanized Rubber & Plastics Company, 178 F.Supp. 723 (E.D.Pa.1959), aff'd, 288 F.2d 257 (3d Cir. 1961), cert. denied, 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961).

In *Vulcanized Rubber*, the defendant was ordered by the FTC to cease and desist from representing, directly or by implication, by any advertisement or labeling that combs which it manufactured were "rubber" or "hard rubber" or were "made of 'rubber' " or "made of 'hard rubber,' " unless such combs were in fact made of vulcanized hard rubber. After the order became final, the defendant labeled its combs "rubber-resin." The United States brought suit under Section 5($l$) of the F.T.C. Act and moved for summary judgment. The defendant's argument that the marking "rubber-resin" was not a "misrepresentation . . . to the purchasers thereof that the same are, in fact, made of 'rubber' or 'hard rubber' " was rejected by the District Court and the court granted summary judgment. 178 F.Supp. at 726.

The Third Circuit panel affirmed this decision stating that "since there was no issue of fact presented, the district court properly disposed of the case on summary judgment." 288 F.2d at 258 n. 2. The court then ruled that "the labeling of the combs as being made of rubber-resin falls within the proscription of the Order." [9] 288 F.2d at 259.

This court holds that there is no genuine issue as to any material fact and that the advertisements here challenged violate the provisions of the FTC order.

There is no dispute as to what words were used or what was shown in the challenged advertisements. The FTC order prohibited any direct representation as well as any implication that a product covered by the order "is a generally effective remedy for tiredness, loss of strength, run-down feeling, nervousness or irritability." Paragraph 1(b). The court has read the television scripts and has viewed the films which were televised. From the oral and visual content of the advertisements, the court has determined that the implicit representations made in the advertisements fall within the scope of the prohibitions in the FTC order. *See* Part II of this opinion.

Defendants attempt to support their contention that a factual dispute exists as to the representations made in the advertisements with the affidavits of so-called expert witnesses. These affiants state that the advertisements do not impress *them* as violative of the order and that *viewers* would not be so impressed. *See* Defendants' Memorandum 54–55 and the affidavits cited therein. However, the question for this court is not whether the challenged advertisements tend to mislead or deceive the viewing public.[10] The sole issue before the court is whether the advertisements fall within the prohibitions of the valid FTC order which became effective on December 24, 1967.

9. Defendants here contend that the basis of the Third Circuit holding in *Vulcanized Rubber* was that the change in labeling from "rubber" to "rubber-resin" was not a material change. Therefore, defendants argue, no issue of fact was presented as to the representation made by the challenged labels and summary judgment was appropriate in that case. Defendants apparently attempt to distinguish the instant case by asserting that the representations contained in the challenged advertisements are materially different from those prohibited by the outstanding FTC order, since none of them contains a direct reference to tiredness or the other symtoms mentioned in the order.

The advertisements challenged in counts 10 and 11 do make direct reference to tiredness, but defendants contend that they comply with the order for other reasons. *See* p. 544 *infra.*

10. In *Vulcanized Rubber, supra,* the Court of Appeals for the Third Circuit stated: " . . . the holding [in *Hindman, supra*] was erroneous, since the sole issue before the court was whether or not the labeling practice was within the proscription of the order and not whether the labeling practice was deceptive." 288 F. 2d at 258n.2.

The Sixth Circuit has already determined that, if they do, they violate Section 12 of the F.T.C. Act because they are false within the meaning of Section 15 of that Act.

■ The court's conclusion has a sound basis in policy. The F.T.C. Act is designed to protect the consuming public and the business community from false advertising. To effectuate this goal, the statute invests the FTC with broad authority to investigate advertising practices, *see* Section 6, 15 U.S.C. § 46, and to prohibit such advertising as the Commission determines is false by the issuance of appropriate cease and desist orders. 15 U.S.C. §§ 45(b), 52(b) and 55. A primary sanction for compelling compliance with such orders, once they become final, is Section 5(*l*) of the Act.

Thus, the statutory framework contemplates that, upon a well-grounded finding of deceptiveness in a company's advertising practices, the Commission will have the power to prevent the continuation or recurrence of such practices by the company. The orders in themselves place the company on notice of what types of advertising violate the statute. It would vitiate the very purpose of the statute to require the Commission, after a valid cease and desist order has gone into effect, to establish in respect to each subsequent advertisement disseminated by the company that it is false or deceptive.

■ Once the Commission establishes that a cease and desist order is in effect and that a particular advertisement has been disseminated which allegedly violates that order, it is for the court to determine as a matter of law whether the oral and/or visual content of the challenged advertisement falls within the scope of the prohibitions in the order.[11]

II. *Merits of the Action*

In reaching the merits of this action, the court must consider each challenged advertisement in relation to the specific injunctions in the FTC order. First, the court will consider paragraphs 1(b), 1(c) and 1(d) of the order.

The three paragraphs prohibit very similar types of representations concerning the effect of Geritol or FemIron on tiredness, loss of strength, run-down feeling, nervousness or irritability, which for brevity may be described as the "tiredness symptoms." The parties appear to agree that if an advertisement violates paragraph 1(d), it will violate paragraphs 1(b) and 1(c) as well. Likewise, it is suggested that any advertisement which is not prohibited by paragraph 1(d) will also comply with the two other paragraphs. *See* Defendants' Memorandum 11; Government Memorandum 27–33.

This approach is sensible. Paragraph 1(d) enjoins the dissemination of any advertisement "which represents directly or by implication that the use of [Geritol or any similar preparation, e. g. FemIron,] will be beneficial in the treatment or relief of [any of the tiredness symptoms,]" unless the advertisement contains certain express disclosures. This prohibition is comparable, if not identical, to the injunction in paragraph 1(b) against representing that the preparation is "a generally effective remedy" for any of the tiredness symptoms and to the paragraph 1(c) injunction against representing that the preparation is "an effective remedy [for any of the tiredness symptoms] in more than a small minority of persons experiencing such symptoms."

It is undisputed that the challenged advertisements do not contain the disclosures set out in paragraph 1(d). Therefore, any advertisement will violate that

---

11. The issue is analogous to the interpretation of a writing in a contract action. Interpretation of the written contract is considered to be a matter of law for the court. *See* 4 Williston on Contracts § 616, particularly at pp. 648–49 (3d Ed. 1961). *See, e. g.*, West, Weir & Bartel, Inc. v. Mary Carter Paint Company, 25 N.Y.2d 535, 307 N.Y.S.2d 449, 452, 255 N.E.2d 709 (1969).

paragraph, if, but only if, it represents directly or by implication that the preparation advertised will be beneficial in the treatment or relief of any of the tiredness symptoms. This test can also be used to determine whether the same advertisement complies with or violates paragraphs 1(b) and 1(c) of the order.

The only other portion of the order which the United States claims has been violated by the challenged advertisements is paragraph 1(e). That paragraph prohibits defendants from disseminating any advertisement "which represents directly or by implication that tiredness, loss of strength, run-down feeling, nervousness or irritability are generally reliable indications of iron deficiency or iron deficiency anemia."

The basic thrust of paragraphs 1(b)– 1(e) of the FTC order is to prohibit the dissemination of any advertisement which "creates the impression that [a] tired feeling is caused by something [i. e. iron deficiency] which Geritol can cure" or which links "common, non-specific symptoms [i. e. any of the tiredness symptoms] with iron deficiency anemia." *J. B. Williams, supra,* 381 F.2d at 889, 890.

Before testing the challenged advertisements against these injunctions in the order, it is appropriate to note some comments of the Supreme Court in Federal Trade Commission v. Colgate-Palmolive Co., 380 U.S. 374, 393, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965), since they are relevant to several of the arguments made by defendants with respect to the commercials at issue here:

> If [defendants] in their . . . commercials attempt to come as close to the line of misrepresentation as the Commission's order permits, they may without specifically intending to do so cross into the area proscribed by this order. However, it does not seem "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." Boyce Motor Lines, Inc. v. United States, 342 U.S. 337 [340, 72 S.Ct. 329, 331, 96 L.Ed. 367] [1952]. 380 U.S. at 393, 85 S.Ct. at 1047.

### A. *Counts One through Four*

The first advertisement to be considered is entitled "Blood Cells" (#G–218–40, TV Script, Parkson Advertising Agency, Inc.) and was disseminated by defendants on June 16, 1969. This dissemination is the basis for count one of the complaint. The television script reads as follows:

1. MS ON TED MACK IN LIBRARY, STANDING NEXT TO LIGHT BOX.
 HE FLIPS SWITCH, LIGHTING UP LEFT HALF OF SHADOW BOX TO SHOW BAD BLOOD CELLS AND TITLE: "IRON-POOR BLOOD BEFORE GERITOL."

1. MACK: (O.C.): Hello, I'm Ted Mack. Your bloodstream has been called your lifeline. Look! You could have iron-poor blood cells like these . . . pale, few in number, badly shaped.

2. DISSOLVE TO FILM CLIP OF "POOR" & "RICH" CELLS. IN THIS SEQUENCE WE WILL USE OUR FILM OF THE BLOOD CELLS FRAMES 2 AND 3.

2. If that's so, take Geritol to build more blood cells . . . better shaped . . . rich in iron . . . like these.

3. CUT BACK TO SHOW MACK STANDING BY LIGHT BOX. HOLDS UP BOTTLE OF TABLETS.

3. There's no finer, more effective way to build iron-rich red blood than with Geritol.

4. CUT TO TWO BOTTLES. BACK TO MACK.

4. Geritol-iron enters your blood-stream fast carrying its blood-building power to every part of your body.

5. TITLE: "TWICE THE IRON IN A POUND OF CALF'S LIVER."

5. Just 2 Geritol tablets or two tablespoons of Geritol liquid contain *twice* the iron in a pound of calf's liver.

6. CUT TO BOTTLES SHOT. TITLE: BUILDS IRON POWER FAST.

6. Take Geritol. It builds iron power in your blood *fast*! Geritol really works!

---

■■■ The United States contends that the phrases "iron power" and "blood-building power," as used in this commercial, suggest that Geritol will have an effect upon tiredness, that it will increase a person's strength, and that it will overcome the feeling of being run-down.[12] Memorandum 29. Defendants reply that the advertisement makes no symptomatic claims at all, that it simply shows the actual effects of Geritol on iron-poor blood cells and states that Geritol will relieve iron deficiency, and that the word "power" refers solely to the strength of the preparation. Defendants' Memorandum 55.

The court holds that dissemination of the advertisement violated paragraph 1 (d) of the order and, therefore, violated paragraphs 1(b) and 1(c) as well. The representations that Geritol carries "blood-building power to every part of your body" and that it "builds iron power in your blood *fast*" clearly imply that a person who takes Geritol will have more power after taking it than he had before. To say that Geritol builds power in your blood is the effective equivalent of saying that Geritol builds power in you. Just as the advertising term "tired blood" was used by defendants to signify the condition of a tired person, *see*

Government Exhibit 1, at 106 (FTC Exhibit 9A appended to FTC opinion, Docket No. 8547, September 28, 1965), so "power in your blood" signifies your condition as a powerful or energetic person. Clearly, the claim in the advertisement that Geritol gives a person power or additional power is a representation by implication that Geritol will be beneficial in the treatment or relief of tiredness, loss of strength, and run-down feeling.

This implied representation is strengthened by the transformation in the advertisement of "iron-poor blood cells . . . pale, few in number, badly shaped," i. e. "tired blood," into "iron-rich red blood" with "more blood cells . . . better shaped . . . rich in iron," i. e. healthy, "untired" blood, as a result of the use of Geritol. While the advertisement only speaks of the transformation of a person's blood cells, the advertisement strongly implies that the same transformation from paleness, weakness and deformity to red-bloodedness, strength and shapeliness will take place in the person himself.

■■ The court further holds that dissemination of the advertisement violated paragraph 1(e) of the order. It has already been shown that the advertisement represents by implication that

---

12. The government asks the court "to give weight to the Commission's finding that the commercials containing the word 'power' violated the order, keeping in mind the Commission's experience in this area . . . ." Memorandum 30. The court declines this invitation. While the Commission's views are relevant to determining the meaning of the order, the question of what representations are made in the advertisements is for the court to determine on the basis of their content. *See* pages 532, 534–535 *supra*.

Geritol will relieve tiredness. The way in which the advertisement claims Geritol will do this is by furnishing iron to a person's body. In this way, the advertisement represents that a person who is tired needs iron; otherwise, Geritol could not be beneficial as claimed in the advertisement. A person who needs iron has an iron deficiency. Thus, it is seen that the advertisement represents by implication that tiredness results from an iron deficiency or, in medical terms, that the tiredness symptoms are generally reliable indications of iron deficiency. This is the type of representation which paragraph 1(e) specifically prohibits.

Counts two through four of the complaint relate to the dissemination by defendants of three different advertisements. The television scripts for these advertisements are reproduced in the Appendix to this opinion as Scripts 1, 2, and 3, respectively.

Each of these three advertisements contains statements by Ted Mack, the announcer, and a concluding title, "Builds Iron Power Fast" or "Builds Iron Power in Your Blood", which are substantially identical to those contained in the "Blood Cells" script discussed above. For the reasons set forth in the court's analysis of that advertisement, the court holds that dissemination of these three advertisements also violated paragraphs 1(b), 1(c), 1(d) and 1(e) of the FTC order.[13]

B. *Counts Five through Seven*

■ The three advertisements challenged in counts 5–7 are entitled "Vacation" and have substantially identical scripts. The "Vacation" television script sued upon in count five (Parkson Advertising Agency, Inc., #G–556–40) reads as follows:

---

1. A MAN AND A WIFE ARE FILLING A STATION WAGON WITH VACATION GEAR. WIFE LOOKS SAD BUT NOT TIRED.

2. WIPE TO TED MACK IN LIBRARY

3. HOLDS UP BOTTLE OF GERITOL TABLETS.

4. CUT TO ECU TABLET BOTTLE. TITLE: "TWICE THE IRON IN A POUND OF CALF'S LIVER" UNDERCUT: "PLUS 7 VITAMINS."

5. DISS TO MAN AND WIFE COMING INTO THE HOUSE AFTER THEIR TRIP. WOMAN IS SMILING. SUPER: "WEEKS LATER."

1. HUSBAND: Honey, we're going on vacation. Why do you look so sad?
WIFE: I found out I have iron-poor blood.

2. MACK: (O.C.): If you have iron-poor blood, don't be sad . . . be glad for GERITOL.

3. Geritol-iron enters your bloodstream fast carrying its high potency iron throughout your whole body.

4. Just two Geritol tablets contain *twice* the iron in a pound of calf's liver . . . *plus* 7 vitamins for nutrition.

5. HUSBAND: It's good to see you smile again.
WIFE: Thanks to the Geritol I've been taking.

---

13. The advertisement challenged in count 4 does not refer to the transformation of pale, iron-poor blood into iron-rich, red blood. Nevertheless, the advertisement violates the order because of the "power" representation.

| | |
|---|---|
| 6. BACK TO TED MACK. | 6. MACK: Check with your doctor, and if iron-poor blood is your problem . . . |
| 7. CUT TO PRODUCT SHOT. SUPER: "BUILDS HIGH POTENCY IRON IN YOUR BLOOD." BULLET: "AMERICA'S NO. 1 TONIC." | 7. . . . don't be sad . . . be glad for Geritol. Geritol builds high potency iron in your blood. Try it! |

———◆———

The scripts of the two other "Vacation" advertisements are reproduced in the Appendix, Scripts 4 and 5.

The court holds that dissemination of these advertisements by defendants violated the FTC order. More specifically, the court holds that the visual impression created by the transformation of the woman in the advertisements from a "sad" to a "glad" state, combined with the references to "high potency iron," represents by implication that the use of Geritol will be beneficial in the treatment or relief of one or more of the tiredness symptoms.

Defendants argue that the "contrast between 'sad' and 'glad' emotions was selected because these are basic human emotions and thus provide human interest." Memorandum 57. Furthermore, defendants assert that "the actresses who portrayed the women who took Geritol were selected specifically to project sadness, and defendants made every effort to assure that sadness, and not tiredness, was projected." *Id.* at 56.

However this may be, the difficulty of carrying out the "sad/glad" theme and, at the same time, complying with the FTC order is manifest in the affidavit of Donald Blauhut, who was in charge of producing the commercials:

A great deal of time, money and worry went into assuring that the women's faces in the so-called sad/glad series of commercials . . . projected sadness but not tiredness. Blauhut Affidavit 1, submitted by defendants.

*See also* Eichler Affidavit 2–3, submitted by defendants: " . . . a great deal of time and money were devoted to obtaining expressions on the subjects which carried the message of sadness but did not carry the message of tiredness. I ran many versions of the commercials to make sure the expressions were not those depicting tiredness."

The court has viewed these commercials carefully and believes that the "sad/glad" contrast in the advertisements may be easily perceived as a contrast between feeling weak and run-down and feeling lively. The wife, who looks dreary and perhaps run-down in her "sad" state at the beginning of the advertisements, looks energetic when she gives a broad smile at the end of the advertisements. There is no question but that the change in her feelings is the result of Geritol:

"Husband: It's good to see you smile again.

Wife: Thanks to the Geritol I've been taking."

Defendants contend that the wife is sad at the beginning of the advertisements, not because she is tired or run-down, but because she has learned that she has iron-poor blood. However, this explanation of the advertisements cannot offset the visual impression just noted. Moreover, the visual impression is strengthened by what must be the common-sense response of many viewers to the advertisements—that the wife is not sad only because of the *knowledge* that she has iron-poor blood, but because of the *effects* that this condition has had and is having on her. In this way, the "sad/glad" contrast produces a "tired/energetic" motif when the wife smiles at the end of the commercials.

Her smile may convey to viewers her happiness that she no longer has iron-poor blood, but it definitely conveys something else as well. It shows her in good spirits and makes her look stronger and healthier. The implication is that she was sad not simply because she had iron-poor blood, but because she was feeling run-down as a result of that fact. Now she is smiling not simply because she has iron-rich blood, but because she feels better as a consequence. Thanks to Geritol.

The phrases, "Geritol-iron enters your bloodstream fast carrying its high potency iron throughout your whole body" and "Geritol builds high potency iron in your blood," reinforce this implied representation. The phrases are very similar to the phrases, "Geritol-iron enters your bloodstream fast carrying its blood-building power to every part of your body" and Geritol "builds iron power in your blood *fast,*" which were used in the "Blood Cells" advertisement discussed

*supra,* at 537–538.[14] "Potency" among other things means "power."[15] While the court agrees with defendants that "high potency iron" does refer literally to the iron content in Geritol, this does not alter the fact that the phrases utilized in the advertisements convey the implicit message that Geritol brings power to the person who takes it.

The court concludes that the dissemination of the "Vacation" advertisements violated paragraphs 1(b), 1(c), 1(d) and 1(e) of the FTC order.

### C. *Counts Eight and Nine*

In counts eight and nine of the complaint, the United States claims that dissemination on various dates of two virtually identical advertisements, entitled "Two Women," violated the FTC order. The television script (Parkson Advertising Agency, Inc. #G–552–40) of the advertisement sued upon in count eight reads as follows:

1. OPEN ON FIRST WOMAN WHO QUESTIONS THE CAMERA.

1. SCOTTIE BLOCK: What are *you* so sad about?

2. CUT TO SECOND WOMAN WITH SAD EXPRESSION WHO ANSWERS THE CAMERA.

2. LOIS SMITH: I found out I have iron-poor blood.

3. PULL BACK TO TWO-SHOT. IN BACKGROUND WE SEE KITCHEN WITH COUNTER, CABINET, SINK AND WINDOW.

3. SCOTTIE BLOCK: So, then it's time . . .

4. FIRST WOMAN PICKS UP AND UNCAPS BOTTLE OF GERITOL TABLETS.

4. . . . you found out about Geritol!

14. *See also* Government Exhibit 3 (Second Compliance Report of defendants) at 28–33, 35–54. The advertisements contained therein included substantially the following: "Geritol-iron works in your bloodstream carrying strength through your body."

15. Webster's Third New International Dictionary 1775 (1963): "potency . . . 1: the quality or state of being potent: a: FORCE, POWER, AUTHORITY . . . ."

| | |
|---|---|
| 5. CUT TO CLOSEUP OF GERITOL TABLET BOTTLE, IN FIRST WOMAN'S HAND, AS SHE POURS FROM IT TWO TABLETS INTO HAND OF SECOND WOMAN. | 5. Geritol can change your iron-poor blood into iron-*rich* blood. Here. I'll start you off. |
| 6. CUT TO CLOSEUP OF SECOND WOMAN. | 6. LOIS SMITH: Geritol really works? |
| 7. PULL BACK TO TWO-SHOT AS FIRST WOMAN NOW POURS WATER FROM TAP INTO GLASS. | 7. SCOTTIE BLOCK: *Course* it really works. |
| 8. CUT TO CLOSEUP OF HANDS OF SECOND WOMAN WITH TABLETS AND BOTTLE. SUPER: "TWICE THE IRON IN A POUND OF CALF'S LIVER." | 8. Those two tablets contain twice the iron in a pound of calf's liver. |
| 9. MOVE IN ON SECOND WOMAN AS SHE SWALLOWS THE TWO GERITOL TABLETS WITH WATER, WHICH FIRST WOMAN HANDS HER. | 9. Like they say . . . Geritol-iron enters your bloodstream fast, carrying its blood-building power throughout your body. |
| 10. SHIMMER DISS. TO SECOND WOMAN HAPPILY EXAMINING DRESSES ON RACK IN DEPT. STORE. SHE HAPPENS TO LOOK UP SMILING AS SHE NOTICES FIRST WOMAN APPROACH. SUPER: "WEEKS LATER". | 10. LOIS SMITH: Hello! SCOTTIE BLOCK: Well! First time I've seen you smile in weeks! |
| 11. CUT TO CLOSEUP OF SECOND WOMAN, STILL SMILING. | 11. LOIS SMITH: Thanks for telling me about Geritol! |
| 12. CUT TO GERITOL TABLET AND LIQUID BOTTLES AND PACKAGES. SUPER: "BUILDS IRON POWER IN YOUR BLOOD". | 12. ANNCR (V.O.): Iron-poor blood? Be *glad* for Geritol! It builds iron power in your blood! Try it. |

---

The script of the advertisement challenged in count nine is reproduced in the Appendix, Script 6.

The court holds that dissemination of these advertisements violated paragraphs 1(b), 1(c), 1(d) and 1(e) of the FTC order. For one thing, the use of the word "power" in these commercials constituted an implied representation prohibited by those four paragraphs. *See* pages 537–538 *supra.* Secondly, the "sad/glad" contrast creates the same visual impression as that produced by the "Vacation" advertisements, discussed *supra,* and, in conjunction with the references to "high potency" and "power," violates the injunctions of those paragraphs. See pages 538–540 *supra.*

D. *Counts Ten and Eleven*

■ These counts relate to the dissemination by defendants of two different advertisements for FemIron. The script of the first of these, entitled "Fem Is for Women" (Parkson Advertising Agency, Inc., #FEM–31–30–REV.), reads as follows:

1. OPEN ON TCU OF THE LETTERS "FEM" IN FEMIRON LOCO.

 1. ANNCR (V.O.): Fem is for women.

2. CUT TO WORD "IRON" IN FEMIRON LOCO.

 2. Iron is for women.

3. SHOT WIDENS TO BECOME FULL PKG OF FEMIRON. WORD "NEW" OVER IT. (IF IT IS POSSIBLE, WE SHOULD INCLUDE BOTH THE LARGE 60'S AND THE STRETCH PACK OF 30'S.)

 3. Femiron is the new all iron tablet for women, to help you . . .

4. DISS TO GIANT FEMIRON PKG. WITH MAN & WOMAN RIDING OUT OF IT ON A TANDUM BIKE.

 4. . . . prevent a shortage of iron.

5. CAMERA MOVES IN FOR TIGHTER SHOT.

 5. A medical journal reports that . . .

6. CAMERA PANS WITH BIKE. THEY PASS A MOTHER ON A BENCH, SMALL CHILDREN PLAYING.

 6. . . . many healthy young women have little or no iron reserves.

7. CU OF TIRED MOTHER. FREEZE FRAME ON HER EXPRESSION.

 7. You see, some women even risk becoming anemic and tired.

8. DISS TO CU OF WOMAN'S HAND HOLDING FEMIRON TABLET TWIXT FINGERS. SUPER: "NEW!" SUPER: "FEMIRON" LOCO.

 8. One Femiron tablet a day gives you iron . . . all iron . . .

9. DISS TO CU OF PROFILE SHOT OF WOMAN. SHE TAKES TABLET WITH WATER.

 9. . . . to maintain the supply you need . . .

10. DISS TO COUPLE LEANING BIKE AGAINST TREE. SHOT SHOULD FAVOR WOMAN.

 10. . . . to prevent iron shortage.

11. FREEZE FRAME ON HER EXPRESSION. SHE IS LAUGHING. VITAL LOOK.

 11. Get new FemIron . . .

12. DISS TO CU OF LARGE BOX OF 60'S AND STRETCH PACK OF 30'S. SUPER TITLE: "THE VERY VERY FEMININE IRON TABLET"

 12. . . . the very, very feminine iron tablet.

The advertisement sued upon in count 11 is entitled "Ever Since Eve" and its script reads as follows:

1. OPEN ON PAN SHOT DOWN TREE. YOUNG COUPLE AT BASE OF TREE ON A PICNIC.

1. ANNCR (V.O.): Ever since Eve . . .

2. YOUNG MAN PULLS GIRL TO HER FEET. PUTS ARM AROUND HER SHOULDER AND THEY WALK OFF.

2. . . . women have faced the problem of preventing a shortage of iron.

3. PAN WITH COUPLE. MOVE INTO CLOSE SHOT FAVORING GIRL.

3. A leading medical journal reports that many healthy young women have little or no iron reserves.

4. COUPLE PASSES A MOTHER WITH SMALL CHILDREN. LOSE COUPLE. PUSH INTO SEE TIRED MOTHER WITH CHILDREN CAUSING A FUSS AND IRRITATING MOTHER. FREEZE FRAME ON MOTHER'S EXPRESSION.

4. You see, some women even risk becoming anemic and tired.

5. SLOW DISSOLVE TO: ECU A PAN SHOT FEMIRON LETTERS ON BOX. THEN . . .

5. Take just one FEMIRON tablet every day.

6. DISS TO CU. WOMAN'S HAND REMOVES TABLETS FROM BOX.

6. FEMIRON gives you iron . . . all iron . . .

7. DISS TO NEGATIVE PROFILE SHOT WOMAN TAKING TABLET.

7. . . . to maintain the supply you need to prevent iron shortage . . .

8. DISS TO GIRL FROM OPENING. SHE LEANS AGAINST TREE. BOY CLOSE TO HER. PUSH IN TO CU OF HER LAUGHING, VITAL LOOK. FREEZE FRAME ON HER EXPRESSION.

8. Get FEMIRON . . . the very, very . . .

9. DISS TO CU OF BOX SUPER: "THE VERY, VERY FEMININE ALL IRON TABLET."

9. . . . feminine all iron tablet.

The court holds that dissemination of each of these advertisements violated paragraphs 1(b), 1(c), 1(d) and 1(e) of the FTC order. The court has already held that FemIron advertisements are subject to the order. *See* pages 531–532 *supra*. Having viewed these advertisements, the court finds that the close-up of the "tired mother" and the statement, "You see, some women even risk becoming anemic and tired," especially when juxtaposed against the "vital look" of the FemIron user, represent by implication that the use of FemIron will be beneficial in the treatment or relief of the tiredness symptoms. For this reason, paragraphs 1(b), 1(c) and 1(d) of the order were violated. Paragraph

1(e) of the order was violated as well for the reasons stated at page 537 *supra*.

Defendants argue that "the sole theme of the FemIron commercials was prevention." Memorandum 58. This argument is simply irrelevant, since the Government does not allege that either of the commercials violated the order because a prevention claim is made. *See* Government Reply Memorandum 3.

Defendants further contend that "the tired, older woman briefly portrayed in the commercial[s] was shown solely to emphasize the condition which might occur if preventive steps were not taken at a younger age." Memorandum 58. According to a Parkson employee, "the ad was not designed to appeal to older women who might already have become iron deficient." Handman Affidavit 1. *See also* Lurie Affidavit 1–2.

This contention is rejected by the court. The advertisements directly represent that women risk becoming anemic and tired from a shortage of iron. The clear implication is that tiredness is a generally reliable indication of iron deficiency or iron deficiency anemia. This implication, which violates paragraph 1 (e), is in no way muted by the prevention claim.

Furthermore, viewers are told that FemIron will supply iron to women who take it and will thereby prevent iron shortage. It is frivolous to argue that the only claim which is thus made is that FemIron will supply iron for the purpose of preventing iron deficiency. It is obvious that FemIron will also provide iron to any woman who takes it, even if she already has an iron shortage. In this way, the advertisements represent that FemIron will overcome an *already existing* iron deficiency. The advertisements strongly suggest that tired viewers, and especially tired elderly women, are probably tired because they have an existing iron deficiency. Consequently, the advertisements unmistakably represent by implication that the use of FemIron will not only prevent tiredness, but will be beneficial in the relief of tiredness as well. The message conveyed is that a tired woman who takes FemIron will soon have a "vital look." This latter representation transgresses the prohibitions of paragraphs 1(b), 1(c) and 1 (d) of the FTC order.

### III. *Penalties*

The final question for the court is whether the Government's demand for the imposition of the maximum penalty of $5000 for each of the 100 violations as to each defendant is justified under all of the facts and circumstances of this case.

Defendants raise three issues with respect to the imposition of penalties in this action. The facts relevant to the determination of these issues are undisputed and, consequently, the court can dispose of them on this motion for summary judgment. After considering these issues, the court will discuss the undisputed factual basis and the reasoning behind the award of penalties which the court has assessed.

### A. *Jurisdiction of the Court*

Defendants challenge the jurisdiction of the court to impose the total amount of penalties which the United States has demanded in its complaint. Defendants argue that no more than $500,000 in penalties may be imposed in this action. The United States has demanded judgment against each defendant in the sum of $500,000 plus interest and costs, totaling more than $1,000,000. The basis of defendants' argument is the Court of Appeals decision in United States v. St. Regis Paper Company, 355 F.2d 688 (2d Cir. 1966), which held that satisfaction of the requirements of Section 16 of the F.T.C. Act [16] is a jurisdic-

---

16. F.T.C.Act, Section 16, 15 U.S.C. § 56: "Whenever the Federal Trade Commission has reason to believe that any person, partnership, or corporation is liable to a penalty under section 54 of this title or under subsection (1) of section 45 of this title, it shall certify the facts to the Attorney General, whose duty it shall be to cause appropriate proceedings to be brought for the enforcement of the provisions of such section or subsection."

tional prerequisite to the commencement of a civil penalty suit by the Attorney General under Section 5(*l*) of the Act. *See* 355 F.2d at 699.

The FTC did certify the facts underlying defendants' liability in this action to the Attorney General, as required by Section 16, and defendants do not challenge the certification as such. *See* Pierpoint Affidavit, Exhibit A; Government Exhibit 5; Defendants' Memorandum 65. However, defendants claim that the certification by the FTC was limited by the "draft of [a] complaint alleging violations of the Commission's order and seeking $500,000 in penalties" which accompanied the certification notice. *See* Pierpoint Affidavit, Exhibit A, at p. 4 and Exhibit B. Defendants contend that, since the Commission "specified" that $500,000 in penalties should be sought in this action, the court lacks jurisdiction to impose penalties in a greater amount. Defendants' Memorandum 66.

The argument is based on a misreading both of Section 16 and of the FTC certification notice. Section 16 only requires that the FTC "certify the *facts*" which give it "reason to believe that any . . . corporation is liable to a penalty" under Section 5(*l*) of the F.T.C. Act. (Emphasis supplied.) Section 16 has absolutely nothing to say about either a certification, or even a recommendation, by the FTC to the Attorney General as to the *amount* of penalties which should be sought in the Section 5(*l*) action. Since the statute does not require that any certification be made in regard to penalties, it can hardly be argued that such a certification, even were it present here, constituted a jurisdictional bar to awarding greater penalties which were demanded by the United States in its complaint. The *St. Regis* decision, *supra*, did not add any jurisdictional requirements to the statute; it merely insisted that the requirement that there be a certification of facts, as specifically prescribed in Section 16, be satisfied before the Attorney General can bring a Section 5(*l*) suit.

Moreover, Section 16 states that it is the "duty" of the Attorney General "to cause appropriate proceedings to be brought for the enforcement" of Section 5(*l*). It cannot be argued that the instant action is not an appropriate proceeding for the enforcement of Section 5(*l*), for it seeks no more than the maximum penalty authorized by that section. *St. Regis* does not militate against this conclusion. Indeed, in *St. Regis* the Second Circuit panel noted:

In Section 16, . . . Congress prescribed the circumstances under which civil penalty actions for violations of Commission orders shall be commenced and the officer of the United States *who shall prosecute them* and *in Section 5(l) it prescribed the amount of the penalty* . . . . 355 F.2d at 694–695. (Emphasis supplied.)

The circumstances under which this action was brought conformed to Section 16 and, consequently, there can be no challenge to the decision of the Attorney General to prosecute the action for the full amount of the penalty prescribed by Section 5(*l*).

Furthermore, the certification by the FTC in no way instructed the Attorney General to limit the relief sought to $500,000 *in toto*. The certification stated:

Pursuant to the provisions of Section 16 of the Federal Trade Commission Act, the Commission hereby certifies *the facts* of violation of its order to cease and desist in its Docket 8547.

The Commission in so certifying *the facts* states that it has reason to believe that the J. B. Williams Company, Inc., and Parkson Advertising Agency, Inc. *are liable for penalties under Section 5 (l) of the Federal Trade Commission Act and therefore recommends that appropriate proceedings be instituted for recovery of civil penalties as prescribed in said section.*

Pierpoint Affidavit, Exhibit A, page 1 (Letter from the FTC to the Honorable

John N. Mitchell, Attorney General of the United States, dated November 28, 1969.) (Emphasis supplied.)

The fact that this letter of certification was accompanied by a "draft of complaint" which only sought a total of $500,000 in penalties did not alter the duty of the Attorney General to bring appropriate proceedings based on the facts which were certified to him nor did it suggest that proceedings seeking $1,000,000 in penalties would not be appropriate. The most that can be said about the inclusion of the "draft" with the letter was that it was intended to facilitate the Attorney General's task.

■ Finally, even were the court to find that the FTC did certify to the Attorney General that the facts of this case only warranted imposition of a total fine of $500,000, this finding would still not create a *jurisdictional* bar to the award of greater penalties under the rationale of the *St. Regis* decision. Not one of the policy arguments which were enumerated by the Court of Appeals in *St. Regis* supports defendants' contention on this point.[17]

The court concludes that it has jurisdiction to award the total amount of penalties demanded by the United States in its complaint.

## B. *The Status of Defendant Parkson*

■ Defendants point out "that Parkson was at all relevant times an affiliate of Williams under common stockholder control (even the percentage shareholding of each stockholder was identical), with identical boards of directors." Memorandum 72. Defendants argue that, since "the corporations are not *de facto* separate," [18] the court cannot impose penalties against each corporation with respect to the same violations of the FTC order. Memorandum 71. It is contended that such an award in this action would constitute "multiple penalties" and would be contrary to the intent of the statute which limits the penalty to $5000 for "each violation" of an FTC order.

The fallacy of defendants' argument is that Section 5(*l*) specifically provides that "*any* person, partnership, or corporation who violates an order of the Commission to cease and desist after it has become final, and while such order is in effect" is liable to "a civil penalty of not more than $5000 for *each* violation." (Emphasis supplied.) Both defendants are subject to the FTC order sued upon here. If both of them have violated the order, they are each liable to the maximum penalty for each of their violations.

17. The Court of Appeals noted the following pitfalls of a "system of dual surveillance and enforcement of FTC orders" (355 F.2d at 695, 697, 698) which would result from allowing the Attorney General to sue under Section 5(*l*) without prior certification by the FTC:

1) such a system "would necessarily involve the possibility of conflicting interpretations of [FTC] orders" (at 695);

2) "such a system could result in stultifying the Commission's implementation of its policies" (at 695);

3) the Attorney General's "office is simply not equipped or designed to intelligently police the Commission's orders" (at 697);

4) "the value of the Commission's practices and rules designed to promote voluntary compliance and avoid the rigors of litigation would be greatly impaired" (at 697);

5) the system "would unjustly hamper those subject to orders by creating uncertainty and doubt as to what course of action to follow" (at 697);

6) it would create "the possibility that unnecessary time and money will be expended in litigation by those subject to Commission's orders and the public" (at 698); and

7) it "would in all probability jeopardize the Commission's vitally important consent order procedure" (at 698).

18. However, defendants admit that Parkson "maintained its separate corporate status solely to preserve its entitlement to the regular advertising agency commission in dealing with the various media." Memorandum 72. In other words, Parkson was not an inactive corporation and it did carry on substantial business for profit.

■ In effect, defendants are asking the court to review the validity of the FTC order which was enforced by the Sixth Circuit in *J. B. Williams, supra.* The Sixth Circuit enforced the order against both defendants and that decision is not reviewable here.[19] *See* page 527 *supra.* Consequently, since each defendant was subject to the order and violated it, each defendant is liable up to the maximum penalty for each violation which has been proved by the United States.

C. *The Number of Violations for which Defendants Are Liable.*

■ The second sentence of Section 5($l$) provides:

"Each separate violation of [a final FTC] order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the Commission each day of continuance of such failure or neglect shall be deemed a separate offense."

In this action, the United States has sued each defendant for 100 distinct and separate violations of the FTC order. The violations involve the dissemination by defendants of the eleven advertisements, discussed *supra,* on 70 different days between June and October, 1969 and on 100 separate network television programs.

Defendants contend that "the penalty imposed by the statute can be invoked only once for the dissemination of each commercial." Memorandum 76. Under this construction of Section 5($l$), each defendant would only be liable to a maximum penalty of $55,000, i. e. $5000 for each of the eleven advertisements.

The contention is without merit. First, the order makes clear that it is the dissemination of an illegal advertisement which violates the order, not the advertisement itself. Second, defendants have been unable to cite any court decision

which supports their proposition, whereas numerous decisions support the government's position. *See, e. g.,* United States v. Wilson Chemical Company, Inc., CCH 1962 Trade Cases ¶70,478 (W.D.Pa. 1962), aff'd per curiam, 319 F.2d 133 (3d Cir. 1963); *Vulcanized Rubber, supra,* 288 F.2d 257; Piuma v. United States, 126 F.2d 601, 603 (9th Cir.), cert. denied, 317 U.S. 637, 63 S.Ct. 28, 87 L.Ed. 513 (1942); United States v. Home Diathermy Company, Inc., CCH 1960 Trade Cases ¶69,601 (S.D.N.Y.1959). Finally, defendants' contention runs counter to the express purpose of Section 5($l$) which seeks to penalize the violation of FTC orders as a means of protecting the public. Harm results each time the same deceptive advertisement reaches consumers and the harm is cumulative.

■■ For these same reasons, the court also rejects defendants' contention that "it seems clear on the face of the statute that the maximum penalty is $5000 for any day on which the order was violated." Memorandum 78. Defendants cannot invoke the "continuing failure or neglect" proviso in Section 5($l$) and argue that "each day of continuance of such failure or neglect shall be deemed a separate offense," for the proviso is not applicable here. The claim of the United States is not that defendants failed or neglected to do something which the FTC ordered them to do, but rather that they did specific acts which were prohibited by the FTC order. As the statute states, "each separate violation of [a final FTC] order shall be a separate offense." The purpose of the "continuing failure or neglect" proviso is to assure that individuals or corporations who fail to do some act which they are specifically required to do by the FTC may be fined more than $5000. Without the proviso, the failure to act might be considered a single violation of the order, subject only to a $5000 penalty, al-

---

19. Of course, defendant Parkson could have challenged the propriety of subjecting it to the order, by raising this issue on the appeal of the order. *See, e. g.,* Doherty,

Clifford, Steers & Shenfield, Inc. v. Federal Trade Commission, 392 F.2d 921, 927–929 (6th Cir. 1968.)

though the violation continued for a substantial period of time. The proviso cannot be relied upon by defendants to limit their liability in this action.[20]

### D. *The Amount of Penalties*

Defendants have requested a factual hearing on the question of the amount of penalties to be asssesed against them. The court held a hearing on January 2, 1973, at which the Government was instructed to submit information establishing the ability of defendants to pay the penalties demanded in this action. The court believes that the information necessary to assess appropriate penalties is now before the court. Therefore, a further hearing on the issue of penalties would serve no useful purpose.

 In determining the amount of penalties to be assessed against defendants, the court thinks that the factors to be considered are their financial ability to pay the penalties demanded, the degree of harm which defendants may have caused by disseminating the challenged advertisements,[21] and their good or bad faith in disseminating these advertisements in violation of the FTC order.[22]

The court believes it appropriate to consider the financial ability of defendants to pay the penalties demanded by the Government in Section 5(*l*) actions. While imposition of maximum penalties against a large corporation may amount to little more than a slap on the wrist, the same penalties may throw a small enterprise out of business. The severity of the sanction imposed necessarily depends on the ability of each particular defendant to pay whatever fines are assessed.

Consequently, the court held the hearing on January 2, 1973 to consider this issue, despite the fact that it had not previously been raised by the parties. At the hearing, it was stipulated that defendant J. B. Williams would have the financial capacity to pay the maximum penalties sought here, assuming that the court were to assess such penalties. [Transcript 5–6]

As for defendant Parkson, however, its counsel represented to the court that Parkson has a net worth of less than $500,000 and could not pay the maximum penalties sought against it. Defendant Parkson has submitted an affidavit by Jerome Cossman, Senior Vice President and chief financial officer of both J. B. Williams and Parkson, dated January 5, 1973, which states that in Mr. Cossman's opinion Parkson could not pay a $500,000 judgment. Attached to the affidavit is a Parkson financial statement dated June 30, 1971. (Parkson has not been separately audited since then, according to Cossman.) The financial statement indicates that Parkson's net income for the fiscal year ended June 30, 1971 was $11,903 and that its retained earnings as of that date were $398,731.

The Government argues that the true financial condition of Parkson is reflected in the amount of advertising business that it does, rather than in its financial accounts. The reason for this is that Parkson, which was an affiliate of J. B. Williams in 1969 and is now its wholly-owned subsidiary, does nearly all of its business with its parent corporation. Consequently, Parkson's earnings can be easily controlled by its parent through the terms of their contractual arrangements. Indeed, the Cossman Affidavit states:

> Parkson's financial arrangement with Williams provides for a monthly

---

20. In any event, were the proviso applicable, defendants would be liable to a maximum penalty of $610,000 each for the disseminations sued upon here since they continued for 122 days from June 2, 1969 until October 1, 1969.

21. *See* United States v. Karns, CCH 1963 Trade Cases ¶ 70,950, at pp. 78,776–77 (S.D.N.Y.1963); *Wilson Chemical Company, supra.*

22. *See* United States v. Beatrice Foods Company, 52 F.R.D. 14, 18 (D.Minn. 1971); United States v. Beatrice Foods Co., 322 F.Supp. 139, 141 (D.Minn. 1971); United States v. H. M. Prince Textiles, Inc., 262 F.Supp. 383, 389 (S.D. N.Y.1966); *Home Diathermy, supra.*

service fee which is sufficient to reimburse Parkson for its expenses of operation and *provide a modest profit of approximately $10,000 per year.* [Affidavit, dated January 5, 1973, at paragraph 5.] (Emphasis added.)

While these contractual arrangements are to be respected, the court believes that the actual financial condition of Parkson is not accurately reflected by these arrangements or by Parkson's financial statement, but rather by Parkson's considerable business operations. The Government has produced a letter from Broadcast Advertisers Reports, Inc. (BAR)[23] which includes an estimate of J. B. Williams' expenditures on network television advertising during the past four years. BAR estimates that J. B. Williams spent far in excess of $10,000,000 per year during this period on network television advertising alone.[24] Geritol advertising materials included in Government Exhibits 1 and 2 make it clear that J. B. Williams has advertised extensively in other media as well.

Parkson handles all of this advertising business. See Cossman Affidavit, dated January 5, 1973, at 2; Rosenhaus Affidavit 1. Parkson's financial statement of June 30, 1971 indicates that its accounts receivable on that date were $1,114,133, reflecting the "monthly budgeted amount" of its media advertising costs which were billed directly to its clients. See Cossman Affidavit, paragraph 6 and Financial Statement, note 1. In view of Parkson's substantial business operations, the court cannot say that the imposition of the maximum penalties demanded by the Government against Parkson, if they are otherwise warranted, would necessarily constitute an impossible financial burden on the company or would be unreasonable.

On the other hand, Parkson is a smaller company than J. B. Williams and, therefore, even though the defendants share equal responsibility for the violations found here, the court will make some downward adjustment in the penalties to be assessed against Parkson. The court also realizes that Parkson may have great difficulty in paying the fines assessed in this action in a lump sum. Consequently, the court will entertain an

---

23. Hynes Affidavit, Exhibit A, dated January 2, 1973 (Letter from David W. Thurston, Executive Vice President of Broadcast Advertisers Reports, Inc. to Patricia M. Hynes, dated December 27, 1972). The letter states that Broadcast Advertisers Reports, Inc. [BAR] is "the broadcast industry's independent source of network television commercial activity and estimated expenditures. BAR monitors every broadcast minute during the year of the ABC, CBS and NBC television networks. . . . Each week, working with the networks, BAR also develops a total time and talent price for each program, from which average commercial minute costs are derived. These costs are applied to each brand monitored in each program. Obviously, average costs are just that. On any given program, some advertisers may be actually paying less than the average, others more."

24. Parkson has not disputed the accuracy of these estimates. BAR's estimate of expenditures in network television for J. B. Williams and selected brands for the years 1969 through the first ten months of 1972 were as follows:

| Year | J. B. Williams Co. | Geritol Liquid | Geritol Tablets | FemIron Iron Tablets |
|------|--------------------|----------------|-----------------|----------------------|
| 1969 | $26,302,500 | $1,649,500 | $5,402,200 | $2,524,000 |
| 1970 | 22,467,800 | 1,382,700 | 5,709,200 | 1,699,200 |
| 1971 | 17,815,200 | 2,830,100 | 4,545,400 | 1,201,200 |
| 10 mos. 1972 | 16,339,900 * | 3,710,500 | 3,776,100 | 1,104,000 |

* For 1972, BAR noted, J. B. Williams' brands are listed under Nabisco as the parent company; the figure shown here is the total of the former J. B. Williams brands.

application by that defendant to pay the penalties over a period of years, in installments with interest, upon a showing of necessity therefor.

 In assessing the penalties in Section 5(*l*) actions, the degree of harm potentially having resulted from the violations charged against defendants should also be given some weight. In a sense, Section 5(*l*) serves the function in deceptive advertising cases of compensating the public for the monetary losses incurred by those individuals who were induced to purchase a product by the deceptive advertising sued upon. However, in such cases, it is difficult to ascertain the amount of money actually wasted by deceived consumers and it is far beyond the competence of the court to make an accurate determination in this regard. Nevertheless, where it is established that unlawful advertising has reached a vast audience at great expense, the court may assume that it has caused significant monetary harm to the public and should take this into account.[25]

 In this action, every violation charged in the complaint relates to the dissemination of an unlawful advertisement over network television to what the court recognizes must have been a very large audience.[26] Each Geritol advertisement was directed at the entire viewing audience, while each FemIron advertisement was directed at the entire female audience. There is a high probability that the advertisements induced substantial numbers of viewers to buy the preparations advertised, although the preparations would be of no benefit to them.

The extent of the deception thus caused is indicated by the following findings of the FTC which accompanied the issuance of the original order to cease and desist:

. . . As we have found, respondents' advertising is directed to the entire population of whom less than 10% have iron deficiency. . . . Most of this group who experience tiredness do not do so as a result of their deficienc[y] since mild cases produce no symptoms. The inescapable conclusion is that *the number of people in the total population who are tired because of iron . . . . deficiency is infinitesimally small.* Unless, therefore, this small group of people, or a majority of them, are the only ones in the entire population who experience tiredness symptoms, respondents' argument must fail. [Respondents argued that there was no valid basis on the record for concluding that in only a small minority of persons is tiredness due to a deficiency of iron.]

The overwhelming weight of the evidence is to the contrary. As we have previously found, the testimony of medical experts . . . establishes that the tiredness symptoms are com-

25. *See Wilson Chemical Company, supra,* CCH 1962 Trade Cases ¶ 70,478, at pp. 76,957–58. In United States v. Vitasafe Corp., 234 F.Supp. 710 (S.D.N.Y.1964), aff'd per curiam, 352 F.2d 62 (2d Cir. 1965), Judge Weinfeld imposed $18,000 in penalties for nine violations of an FTC order. Each violation related to conduct which only affected a single individual and where the harm to him or her was apparently minimal. The court did note, however, the "widespread violations" by defendant of the FTC order. 234 F.Supp. at 716.

26. For example, the disseminations charged in count 4 were made during the following network programs: June 11—ABC News (7:00–7:30 P.M.); June 12—NBC, "Dragnet" (9:30–10:00 P.M.); June 16—ABC, W. Sonnett (8:30–9:30 P.M.); June 18—NBC, "The Virginian" (7:30–9:00 P.M.); and June 19—NBC, "Ironside" (8:30–9:30 P.M.). The disseminations relating to count 7 were as follows: August 21 and August 28—CBS, "The Prisoner" (8:00–9:00 P.M.); September 2—CBS, "Walter Cronkite News" (7:00–7:30 P.M.); and September 3—CBS, "Beverly Hillbillies" (9:00–9:30 P.M.). This sample is entirely typical of the other disseminations sued upon in the complaint. *See* Government Exhibit 2, at 98–116 (Schedule from April 1, 1969 through September 18, 1969 of Geritol television advertising submitted to the FTC by letter from J. B. Williams, dated September 29, 1969.)

mon manifestations of almost any disease or disorder, and that the commonest causes of tiredness are neurosis and anxiety . . . .

Contrary to respondents' contentions, we conclude that the charge in the complaint that Geritol will benefit only a small minority of persons with tiredness symptoms, is supported by substantial evidence in this record.

Government Exhibit 1, at 96–97. (In the Matter of The J. B. Williams Company, FTC Docket No. 8547, Opinion of the Commission, dated September 28, 1965.) (Emphasis supplied.)

The Sixth Circuit held, on appeal, that there was substantial evidence to support the conclusions of the Commission in this regard. *See J. B. Williams, supra*, 381 F.2d at 889–890.

Therefore, consideration of the degree of harm potentially caused by defendants' violations of the order does not warrant any mitigation of the penalties to be assessed against defendants.

Finally, the court must consider the good or bad faith of defendants in disseminating the unlawful advertisements in this case. This factor is most important to the proper assessment of penalties, since the purpose of Section 5(*l*) is to coerce compliance with FTC orders. If a violation of a FTC order is merely the result of mistake, inadvertence, or even ordinary negligence, there is little reason for imposing a substantial penalty.[27] On the other hand, where a corporation wilfully violates an FTC order or acts with reckless disregard of the injunctions in the order, there is every reason to impose a penalty at or near the maximum prescribed. This is the treatment which the corporation must expect, for having been ordered to cease and desist from illegal practices, the corporation well knows the consequences of continuing those practices and should not be allowed to retain the profits derived thereby. Moreover, this is the most effective means of preventing others subject to FTC orders from flouting their proscriptions.

In evaluating the good or bad faith of defendants, the court takes particular note of their failure to demonstrate any serious intent to comply with the FTC order during the first year and a half in which it was in effect. For example, over a year after the order became final, defendants included in their Second Report of Compliance to the Commission five sets of advertisements which represented that: "For iron-poor, tired blood, try Geritol." Government Exhibit 3, at 27–33, 35–54 (FTC Docket No. 8547, filed January 31, 1969.) The only other advertisements submitted in the report contained the "power" representation discussed *supra*. Four of these are the targets of counts 1–4 of the instant action. *Id.* at 23–26, 34 (Exhibit AA of Second Report of Compliance.)

Defendants' effort to establish in their proof and arguments that it was difficult for them to understand the terms of the order is not well taken, for the meaning of the order is hardly abstruse. Defendants' argument as to "Williams' strenuous efforts to put itself in compliance with the Modified Order" (Memorandum 81) is likewise specious. To comply with the order, all that was required was the use of advertisements which did not make the forbidden representations or which included the disclosures prescribed in paragraph 1(d) of the order. Such a task did not demand substantial modification of defendants' business operations and should positively have been achieved in less than six months, to say nothing of the seventeen-month period which the FTC allowed. *Cf.* Government Exhibit 4, Dissenting Statement of Commissioner Elman (FTC News Release dated June 25, 1969.)

Thus, the background of the instant action is the history of defendants' efforts to accomplish precisely what the order forbids without incurring any penalty for doing so. Nothing contained in

---

**27.** The claim of inadvertence or negligence was raised and rejected in *Vitasafe Corp., supra* note 25, 234 F.Supp. at 712.

the affidavits of Mr. Rosenhaus, principal stockholder and chief executive officer of defendants in 1969, or of Mr. McGlothlin, counsel to defendants in 1969, detracts in the slightest from this conclusion.[28]

With this background in mind, the court turns to considering the good or bad faith of defendants in disseminating the challenged advertisements in the period of June-October, 1969, 17–20 months after the order became final.

The court has held that dissemination of the advertisements sued upon in counts 1–4 and 8–9 violated the FTC order primarily because of the use of the word "power" in the context of the advertisements. Each such dissemination, which constituted a separate violation of the order, as discussed above, occurred between June 2, 1969 and June 20, 1969.

It is undisputed that the following events took place prior to June 2, 1969. On January 31, 1969, defendants submitted their Second Report of Compliance to the FTC. Exhibit AA of the Report included the scripts of the advertisements here challenged in counts 1–4. Government Exhibit 3, at 23–26, 34. On May 8, 1969, a letter was sent to defendants' counsel from the head of the FTC's Division of Compliance. The letter stated:

"I have been instructed to contact you and inform you that the Commission would be favorably disposed to accepting as compliance with its order to cease and desist . . . the continued use of the AA advertisements *only with deletion from them of all references to 'power'*." Government Exhibit 2, at 1. (Emphasis supplied.)

By letter dated May 15, 1969, Mr. McGlothlin wrote the Commission on behalf of defendants as follows:

"Respondents agree to remove the word 'power' from the advertisements designated in the last Compliance Report as 'AA', without conceding that the use of that word was in violation of the Order." Government Exhibit 2, at 2. *See also id.* at 21.

It is clear that the FTC's advisory instructions were entirely reasonable, since the court has independently found that the use of the word "power" did violate the order. At the least, the advice thus given to defendants put them on explicit notice of the FTC's views with respect to the "power" representation and should have received close attention by defendants. If defendants disagreed with the FTC's position, they had the option of appealing the determination under 5 U. S.C. §§ 701–706, *see* Rettinger v. Federal Trade Commission, 392 F.2d 454, 457 (2d Cir. 1968), or perhaps seeking a declaratory judgment.

Instead, defendants persisted in disseminating the challenged advertisements containing the word "power" after receipt of the advisory instructions on May 8, 1969 and even after receipt of a formal notice of the FTC's position on June 9, 1969. *See* Rosenhaus Affidavit 9. These disseminations continued until June 20, 1969. The recited facts reveal a total lack of good faith with respect to the dissemination of these advertisements and, if not wilful violations of the order, at least reckless disregard of its prohibitions. The violations were only slightly less egregious than if defendants had disseminated the very advertisements relied upon by the FTC when it originally issued the order.

Within a *short time, much less than 30 days after the Commission's letter*, the AA commercials were completely discontinued, and . . . new commercials were in use.

Of course, if defendants intended to comply with the order, they could have discontinued the commercials immediately. *See* Pisani Deposition; Affidavits of Laffey and McCullough, submitted by the government.

---

28. Indeed, the attitude of Mr. Rosenhaus toward compliance with the FTC order is well reflected in his affidavit:

On June 9, 1969, a representative of Williams received a letter from the Commission, . . . stating "The Commission is of the view that the AA commercials will comply with the order if all references to 'power' are deleted."

\* \* \* \* \*

Therefore, the court finds it appropriate to impose the maximum penalty against J. B. Williams as to each of the violations charged in counts 1–4 and 8–9. For the reasons stated at page 549 *supra*, the court imposes a lesser penalty of $4,000 per violation against defendant Parkson.

As for counts 5–7, defendants did not submit the challenged advertisements to the FTC for advice prior to their dissemination,[29] despite the fact that defendants' own employees were well aware of the possibility that the advertisements might violate the outstanding order. *See* p. 539 *supra*. After including the scripts in their Third Report of Compliance, which was submitted to the FTC on July 2, 1969, defendants continued to disseminate these advertisements without awaiting advice by the Commission as to their acceptability.

These facts establish defendants' bad faith with regard to these violations. Defendants' conduct amounted to gross negligence and bordered on recklessness. The court assesses a penalty of $4,000 against J. B. Williams and $3,000 against defendant Parkson with respect to each violation charged in counts 5–7.

Counts 10 and 11 involve dissemination of the FemIron advertisements. Defendants did not submit any FemIron advertising to the FTC for its consideration until they were requested to do so by letter from an FTC attorney, dated July 7, 1969. Government Exhibit 2, at 53–54. Defendants were notified soon thereafter that: "The Division of Scientific Opinions [of the FTC] is of the opinion that FemIron and Geritol have substantially similar properties." Government Exhibit 2, at 56 (Letter from Ms. Saxon, FTC Attorney, dated July 16, 1969.)

The two FemIron advertisements sued upon make specific reference to tiredness and show a close-up of a "tired mother." See pages 542–544 *supra*. They were disseminated in September, 1969 and on October 1, 1969, over one month after defendants were advised that the appropriate division of the FTC considered FemIron to be covered by the order.[30]

The court concludes that the violations charged in counts 10 and 11 were in wilful disregard of the FTC order. The maximum penalty will be imposed against J. B. Williams as to each of these violations and $4,000 per violation against defendant Parkson.

## IV. *Judgment*

The court will issue an order requiring defendants to forfeit and pay to the United States the following civil penalties for the reasons set forth in this opinion:

| J. B. WILLIAMS | | PARKSON |
|---|---|---|
| Count 1 | —$ 5,000 | $ 4,000 |
| Count 2 | —$ 20,000 | $16,000 |
| Count 3 | —$ 30,000 | $24,000. |
| Count 4 | —$ 25,000 | $20,000 |
| Count 5 | —$ 40,000 | $30,000 |
| Count 6 | —$120,000 | $90,000 |
| Count 7 | —$ 16,000 | $12,000 |
| Count 8 | —$ 30,000 | $24,000 |
| Count 9 | —$ 15,000 | $12,000 |
| Count 10 | —$ 90,000 | $72,000 |
| Count 11 | —$ 65,000 | $52,000 |

Total penalties assessed against J. B. Williams equal $456,000. Total penalties against Parkson equal $356,000.

As the court has indicated *supra*, it will entertain an application by defendant Parkson to pay the penalties in installments, with interest, upon a showing of necessity therefor.

29. *See* Federal Trade Commission v. Colgate-Palmolive Co., 380 U.S. 374, 394, 394 n. 22, 85 S.Ct. 1035, 1047, 13 L. Ed.2d 904 (1965):

> If . . . a situation arises in which respondents are sincerely unable to determine whether a proposed course of action would violate the present order, they can, by complying with the Commission's rules, oblige the Commission to give them definitive advice as to whether their proposed action, if pursued, would constitute compliance with the order.

30. In a letter dated September 3, 1969, the Commission officially notified defendants that FemIron "is subject to the order." Government Exhibit 2, at 64.

554

## APPENDIX A

### Script 1

Parkson Advertising
Agency, Inc., #G–218–30, reads as follows:

| | | | |
|---|---|---|---|
| 1. | MS ON TED MACK IN LIBRARY STANDING NEXT TO LIGHT BOX. | 1. | MACK (O.C.): Your bloodstream has been called your lifeline. Look! You could have iron-poor blood cells like these . . . |
| 2. | HE FLIPS SWITCH, LIGHTING UP LEFT HALF OF SHADOW BOX TO SHOW BAD BLOOD CELLS AND TITLE: "IRON-POOR BLOOD BEFORE GERITOL" | 2. | pale, few in number, badly shaped. |
| 3. | DISSOLVE TO FILM CLIP OF "POOR" & "RICH" CELLS. IN THIS SEQUENCE WE WILL USE OUR FILM OF THE BLOOD CELLS FRAMES 2 & 3. | 3. | If that's so, take Geritol to build more blood cells . . . better shaped . . . rich in iron. |
| 4. | CUT TO ECU OF TWO BOTTLES & ZOOM BACK. | 4. | Geritol-iron enters your bloodstream fast carrying its blood-building power to every part of your body. |
| 5. | CUT TO INSERT OF TABLET JAR IN MACK'S HAND. SUPER TITLE: "TWICE THE IRON IN A POUND OF CALF'S LIVER". | 5. | Just two Geritol tablets contain *twice* the iron in a pound of calf's liver. |
| 6. | CUT TO MACK. DOLLY BACK TO REVEAL BOTH BOTTLES. TITLE: "BUILDS IRON POWER FAST" LOGO IN CIRCLE: AMERICA'S NUMBER ONE TONIC. | 6. | Take Geritol to build iron power in your blood *fast*! |

APPENDIX B

Script 2

Parkson Advertising
Agency, Inc., #G–219–40, reads as follows:

1. OPEN ON ECU OF TED MACK IN LIBRARY SETTING.

 1. MACK: Hello, I'm Ted Mack. Have you ever asked yourself . . .

2. DISS TO WOMAN WHO LOOKS QUESTIONINGLY AT CAMERA. SHE IS *NOT* TIRED.

 2. WOMAN (O.C.): "Can iron-poor blood happen to me?"

3. DISS TO CU MACK.

 3. MACK: Check with your doctor. The answer may be yes. Especially if you're a woman.

4. HE HOLDS UP TABLET BOTTLE.

 4. You may need iron . . . to change pale, iron-poor blood into iron-rich, red blood.

5. MACK HOLDS UP TABLET BOTTLE. ECU ON BOTTLE.

 5. There's no finer, more effective iron tonic in the whole world than Geritol.

6. CONTINUE ON MACK AS HE TALKS

 6. Geritol-iron enters your bloodstream fast carrying its blood-building power to every part of your body.

7. CUT TO ECU OF TABLET AND LIQUID BOTTLES. TITLE: "TWICE THE IRON IN A POUND OF CALF'S LIVER".

 7. Just two Geritol tablets or two tablespoons of Geritol liquid contains *twice* the iron in a whole pound of calf's liver.

8. CUT BACK TO MACK, MOVE BACK TO REVEAL BOTH BOTTLES UP FRONT. TITLE: "BUILDS IRON POWER IN YOUR BLOOD".

 8. Get Geritol America's number one tonic . . . it builds iron power in your blood. Geritol really works!

APPENDIX C

Script 3

Parkson Advertising
Agency, Inc., #G–219–30, reads as follows:

1. OPEN ON ECU OF TED MACK IN LIBRARY SETTING.

 1. MACK: Have you ever asked yourself—

2. DISS TO WOMAN WHO LOOKS QUESTIONINGLY AT CAMERA. SHE IS *NOT* TIRED.

 2. WOMAN (O.C.): "Can Iron-poor blood happen to me?"

3. DISS TO CU MACK.

 3. MACK: Check with your doctor. The answer may be *yes*—especially if you're a woman.

4. HE HOLDS UP TABLET BOTTLE.

 4. You may need iron.

5. MACK HOLDS UP TABLET BOTTLE. ECU ON BOTTLE.

 5. There's no finer, more effective iron tonic in the world than Geritol.

6. CONTINUE ON MACK AS HE TALKS

 6. Geritol-iron enters your bloodstream fast carrying its blood-building power to every part of your body.

7. CUT TO ECU OF TABLET BOTTLE. TITLE: "TWICE THE IRON IN A POUND OF CALF'S LIVER".

 7. Just two Geritol tablets contain twice the iron in a pound of calf's liver.

8. CUT BACK TO MACK. MOVE BACK TO REVEAL BOTH BOTTLES UP FRONT. TITLE: "BUILDS IRON - POWER IN YOUR BLOOD."

 8. Take Geritol, America's *Number One Tonic*—it builds iron power in your blood. Geritol really works!

APPENDIX D

Script 4

Parkson Advertising
Agency, Inc., #G–556–30, reads as follows:

1. A MAN AND A WIFE ARE FILLING A STATION WAGON WITH VACATION GEAR. WIFE LOOKS SAD BUT NOT TIRED.

1. HUSBAND: Honey, we're going on vacation. Why do you look so sad?
WIFE: I found out I have iron-poor blood.

2. WIPE TO TED MACK.

2. MACK: (O.C.): If you have iron-poor blood, don't be sad . . . . be glad for GERITOL!

3. CUT TO ECU OF GERITOL TABLETS TITLE: "TWICE THE IRON IN A POUND OF CALF'S LIVER".

3. Geritol-iron enters your bloodstream fast carrying its high potency iron throughout your whole body.

4. DISSOLVE TO MAN AND WIFE COMING INTO THE HOUSE AFTER THEIR TRIP. WOMAN IS SMILING. SUPER: "WEEKS LATER".

4. HUSBAND: It's good to see you smile again.
WIFE: Thanks to the Geritol I've been taking.

5. BACK TO MACK.

5. MACK: Check with your doctor. If you have iron-poor blood don't be sad . . . be glad for GERITOL!

6. CUT TO PRODUCT SHOT. SUPER: "BUILDS HIGH POTENCY IRON IN YOUR BLOOD". BULLET: "AMERICA'S NO. 1 TONIC".

6. It builds high potency iron in your blood. Try it!

## APPENDIX E

### Script 5

Parkson Advertising
Agency, Inc., #G–556–40–ALT, reads as follows:

1. A MAN AND A WIFE ARE FILLING A STATION WAGON WITH VACATION GEAR. WIFE LOOKS SAD BUT NOT TIRED.

 1. HUSBAND: Debby, we're going on vacation. Why do you look so sad?
 WIFE: I found out I have iron-poor blood.

2. WIPE TO TED MACK IN LIBRARY.

 2. MACK: (O.C.) If you have iron-poor blood, don't be sad . . . be glad for GERITOL!

3. HOLDS UP BOTTLE OF GERITOL TABLETS. (LEFT HAND).

 3. Geritol is the high potency iron tonic that carries blood-building iron throughout your whole body.

4. CUT TO ECU TABLET BOTTLE. TITLE: "TWICE THE IRON IN A POUND OF CALF'S LIVER." UNDERCUT "PLUS 7 VITAMINS."

 4. Just two Geritol tablets contain twice the iron in a pound of calf's liver . . . plus 7 vitamins for nutrition.

5. DISS. TO MAN AND WIFE COMING INTO THE HOUSE AFTER THEIR TRIP. WOMAN IS SMILING SUPER: "WEEKS LATER."

 5. HUSBAND: It's good to see you smile again.
 WIFE: Thanks to the Geritol I've been taking.

6. BACK TO TED MACK.

 6. MACK: Check with your doctor, and if iron poor blood is your problem . . .

7. CUT TO PRODUCT SHOT. SUPER: "CHANGES IRON–POOR BLOOD INTO IRON-RICH BLOOD."

 7. . . . don't be sad . . . be glad for Geritol. High potency Geritol changes iron-poor blood into iron-rich blood.

## APPENDIX F

Script 6

Parkson Advertising
Agency, Inc., #G–552–30, reads as follows:

1. OPEN ON FIRST WOMAN, WHO QUESTIONS THE CAMERA:

 1. SCOTTIE BLOCK: What are *you* so sad about?

2. CUT TO SECOND WOMAN WITH SAD EXPRESSION WHO ANSWERS THE CAMERA.

 2. LOIS SMITH: I found out I have iron-poor blood.

3. PULL BACK TO TWO-SHOT. IN BACKGROUND WE SEE KITCHEN COUNTER, CABINET, SINK AND WINDOW.

 3. SCOTTIE BLOCK: Then it's time . . .

4. FIRST WOMAN PICKS UP AND UNCAPS BOTTLE OF GERITOL TABLETS.

 4. . . . you found out about Geritol!

5. CUT TO CLOSEUP OF GERITOL TABLET BOTTLE. IN FIRST WOMAN'S HAND AS SHE POURS FROM IT TWO TABLETS INTO HAND OF SECOND WOMAN.

 5. Geritol can change your iron-poor blood into iron-*rich* blood. I'll start you off.

6. CUT TO CLOSEUP OF SECOND WOMAN.

 6. LOIS SMITH: Geritol really works?

7. PULL BACK TO TWO-SHOT AS FIRST WOMAN NOW POURS WATER FROM TAP INTO GLASS.

 7. SCOTTIE BLOCK: Of course.

8. CUT TO ECU TABLET PACKAGE.

 8. Geritol-iron enters your bloodstream fast . . .

9. MOVE IN ON SECOND WOMAN AS SHE SWALLOWS THE TWO GERITOL TABLETS WITH WATER, WHICH FIRST WOMAN HANDS HER.

 9. . . . carrying its blood-building high potency iron throughout your body.

APPENDIX F—continued

Script 6—continued

Parkson Advertising—continued
Agency, Inc., #G–552–30, reads as follows:—continued

10. SHIMMER DISS. TO SECOND WOMAN HAPPILY EXAMINING DRESSES ON RACK IN DEPT. STORE. SHE HAPPENS TO LOOK UP SMILING AS SHE NOTICES FIRST WOMAN APPROACH. SUPER: "WEEKS LATER".

10. LOIS SMITH: Hello.
SCOTTIE BLOCK: You're smiling.

11. CUT TO CLOSEUP OF SECOND WOMAN, STILL SMILING.

11. SCOTTIE BLOCK: Thanks to Geritol!

12. CUT TO GERITOL TABLET AND LIQUID BOTTLES AND PACKAGES SUPER: "BUILDS IRON POWER IN YOUR BLOOD".

12. ANNCR: (V.O.): Iron-poor blood? Be glad for Geritol. Builds high potency in your blood. Try it.